### FRED PLACKER v. THE STATE.

No. 46. Decided November 10, 1909.

Rehearing granted February 2, 1910.

**1.—Theft from the Person—Evidence—Other Offenses.**

See opinion for statement as to the admission of certain testimony with reference to defendant's account of money received out of a gambling transaction.

**2.—Same—Remarks by Judge—Practice in District Court.**

Upon trial of theft from the person where the defendant tried to account for certain money in his possession and where the State's attorney asked the witness on cross-examination whether defendant had won the money at a game of cards which was answered in the affirmative, whereupon the State's attorney put the question to the witness whether it was not a fact that gamblers sometimes had money and sometimes they did not, to which the defendant objected, and the court in overruling the objection stated that this was the most material question the district attorney had asked the witness, to which remarks of the court the defendant objected, the same was reversible error.

**3.—Same—Insufficiency of the Evidence.**

See opinion of the court for evidence in a trial of theft from the person, which in view of the entire record on appeal is held to be hardly sufficient to sustain a conviction.

Appeal from the District Court of Atascosa. Tried below before the Hon. E. A. Stevens.

Appeal from a conviction of theft from the person; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*J. W. Preston* and *W. W. Walling,* for appellant.

*F. J. McCord,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of theft from the person, and his punishment assessed at two years confinement in the penitentiary.

The following is the evidence introduced upon the trial of this case: "Chas. Grafmiller, a witness for the State, testified: My name is Chas. Grafmiller, and I live in Atascosa County, Texas. I know both of the defendants. On the 30th day of January, 1909, the defendants came to my house at Rossville, and Wesley got to my house after Fred, about a half hour. It was about five o'clock in the evening. I was working around my mill, grinding corn and chops, and I asked Fred to put up his horses and get something to feed them with, and then go to Ella Newman's and get some pork and cook their supper, as I had had my lunch. About six o'clock a Mexican barber named Rindon came to my house and cut the hair of the defendants and shaved them, as they said that they were going to a dance. After I saw Rindon leave, and the boys kept waiting around, I was anxious for them to go on to the dance, so I could count my money and post up my books. They kept staying, and I went and laid down on my bed with my clothes on and went to sleep. I put my money in my pocketbook and in my pants pocket. There was about twenty-seven or eight dollars in my purse, three five dollar bills, one one dollar bill, the rest in silver. I slept about an hour and a half, and was aroused by something. I can not explain how; felt as though something touched me, and immediately felt for my money and said: 'Boys, my money is gone.' They were then in the same place where they were when I laid down. I then said: 'Nobody has been here but you.' And they said: 'Yes, a Mexican has been here.' I then got up and we looked for the money, the defendants and myself, under the mattress, under the table, and various other places in the house. I had good reason for not searching them. I was afraid. They then left the house, saying that they were going to the dance. In a few minutes after they were gone, I ran up to Ella Newman's house, who I thought was a deputy sheriff. It was then about ten o'clock at night. I told Mr. Newman about losing my money, and then returned to my house. I saw no more of the defendants until they returned to my house about five o'clock in the morning. Wesley Placker knocked at my door, and said: 'Charley, let us in.' I told Newman I was sure Plackers got my money, and I wanted him to arrest them. He said he would have to have a warrant. Then I wanted him to watch them. I got up and opened the door, and

they came in. Fred was drinking heavily. After they came Fred re-
marked to Wesley: 'You damned son-of-a-bitch, I can whip you and
Charley.' By 'Charley' meaning myself. I heard something drop on
the table in the room. I did not know what it was, and didn't know
who dropped it or put it there, but I went over to the table and saw
a pistol there, which was not there when I went to bed. Both defend-
ants went to bed at my house then and went to sleep. I did not go to
bed again. Wesley got up about six or seven in the morning, but Fred
was still sleeping when the officers came to my place to arrest him that
morning. After Fred got up I sent him to Mrs. Fowler's to get some
bread to bring to me, as she usually baked for me. He came back but
did not bring the bread, and then he was arrested. Just before they
left for the dance, Wesley asked me to loan Fred fifty cents, which I
did. Wesley had been staying at my house for about a month, day
and night, boarding and staying there. He was engaged in carrying
the mail from Pleasanton to Rossville and back. I have known the
defendants for a number of years. Fred has stayed at my house many
times, day and night, but had not been to my house for nearly a year
until on the above occasion. I did not see them take my money, nor
do I know that they did take it, but I have a suspicion that they did
do it, and this is why I had them arrested. The pocket in which my
money was placed is so small that only one hand could be put into it
at one time. I gave Fred permission to stay at my house and charged
him nothing.

"Roman Rindon, a witness for the State, testified as follows: My
name is Roman Rindon, and I know the defendants. I saw them at
Charley Grafmiller's house on the 30th day of January, 1909, at about
six o'clock in the evening. I shaved Fred Placker, and cut the hair
and shaved Wesley Placker, and they paid me for doing this. They
took the money from their pockets to pay me with. Charley Graf-
miller was sitting in a chair in the room when I got there. He ap-
peared to me to be drunk. About a half an hour before I left Graf-
miller went to bed with his clothes on, and did not talk for about a
half hour before I left. He was either sleeping or appeared to be
sleeping. I left after having been there about one and a half hours,
and went to my home, and then went over to the dance, and between
nine and ten o'clock the defendants came to the dance. I was with
them at the dance all the time they were there, but saw them with no
money, but there was no occasion for them to show any money there.
Between ten and eleven o'clock the defendants and myself left to go
home. We met Juan Cruz, and the defendants went back with him
to the dance, and I went on home and saw no more of them. I am
guessing as to the time of night. Can't say positively what time it
was.

"J. H. Barrow, a witness for the State, testified as follows: About
a week or ten days after the alleged theft of Chas. Grafmiller's money,
the defendant Fred Placker was at my store in Amphion, and spent

at different times from then until he was arrested about twelve dollars, and gave me three five dollar bills to change. The distance from my store to Chas. Grafmiller's house is about ten miles. On the day that the defendant Fred Placker went to Pleasanton with Mr. Gunn, he changed one of these five dollar bills.

"J. G. Gunn, a witness for the State, testified as follows: My name is J. G. Gunn. On the morning of February 11, 1909, the defendant Fred Placker got me to bring him and his brother from Amphion to Pleasanton, and he paid me $2.50 for doing this. They had a little silver, but not enough to pay the $2.50, and then they gave me a five dollar bill to get my $2.50 out of it. I saw two other bills, one of them being a five dollar bill, but I don't know what the other one was.

"Ed Fern, a witness for the defendants, testified as follows: My name is Ed Fern, and I know the defendants. Fred Placker came to my house about ten days after the theft alleged to have been committed at Chas. Grafmiller's house. He arrived at my store about 12 o'clock the day before Mr. Gunn took him to Pleasanton, Texas. While he was at my house on that day I saw Tom Sinclair pay him twenty-five dollars, four five dollar bills, and the balance in silver, and he gave one of these five dollar bills back to Tom Sinclair on the same day, a little later. On this same day I paid the defendant Fred Placker three dollars in silver. What I mean by paying is, we were in the bed of a creek playing cards, and Placker won the money from Sinclair and I, and was playing when the money was won by him. This was several days before Grafmiller lost his money. Gamblers some days have money and then have none.

"On cross-examination the witness said:

"Tom Sinclair paid the defendant Fred Placker this money because he, defendant, and myself and Tom Sinclair and other persons had been playing cards and Fred Placker had won this amount from Sinclair and the three dollars from me.

"Oscar Placker, a witness for the defendants, testified as follows: I am a brother of the defendants. When the defendant Fred Placker came to Amphion from where he had been working on the railroad for Mr. Bawder, I gave him three dollars.

"Joe Bawder, a witness for the defendants, testified as follows: The defendant Fred Placker was working for me on the Simmons railroad, and left about the 27th day of January, 1909, and I paid him something less than three dollars. He was gone until about the 3d of February, when he returned to work. He left again about the 10th day of February, 1909, and I paid him five dollars. Where he was working is some fifteen miles from Rossville. I live in Medina County, and was subpoenaed by the State. Defendant Fred Placker received his wages regularly and at no time while he was working for me was I indebted to him more than five dollars. I was due him three dollars when he quit working for me, and I sent him the money while he was in jail.

"Wesley Placker, one of the defendants, testified as follows: I am a brother of the defendant Fred Placker, and am one of the defendants in this case. In January, 1909, I was engaged in carrying the mail for Sam Camp from Pleasanton, Texas, to Rossville, for twenty dollars per month. I met Fred Placker in Pleasanton, January 30, 1909, and he went with me to Rossville the same day. We reached Rossville about five o'clock p. m. We stopped at the house of Chas. Grafmiller, where I had been staying for about a month. Grafmiller invited Fred to stop with him, and offered him feed for his horse, and treated him as a welcome guest. Grafmiller gave Fred fifty cents to go to Newman's and get some meat, saying that he had already had his lunch. Roman Rindon came to the house and cut my hair and shaved me and Fred, and we paid him for it. Grafmiller was drinking, and he laid down on the bed, and was sleeping some hour or more before Rindon left. Rindon left about six o'clock in the evening. Soon after Rindon left, Fred and I left and went up the road to wait for Rindon, who had promised me to meet us to go to a dance at Tober's house. Grafmiller did not loan fifty cents at my request to Fred. Soon after Rindon left Grafmiller's house, Fred and I went up the road about two hundred feet from Grafmiller's house, to wait for Rindon, as he requested us to do, and we would all go together to the dance. After waiting something over half an hour Fred and I started to the dance, Rindon not coming. While passing Grafmiller's house we went in to warm ourselves and see if Grafmiller was all right. He was still sleeping on the bed and was groaning, and I said: 'Charley, what's the matter? Do you want something?' He said: 'I want some whisky.' I said that I did not know where to get any whisky, and he said: 'Maybe you can get some over at the dance.' He then got up, and put his hand in his pocket, and said: 'My money's gone;' and then said: 'Look on the table, maybe it's over there.' He did not charge anyone with taking it, but acted as though he had lost it, and didn't know where it was. He and Fred and myself made a search all over his house for the money, but failed to find it. While we were gone from his house anyone could have gone into his house without our having seen it. Neither Fred nor I took his money, and I don't know who took it, if it was taken. After this we went to the dance. We got there about nine o'clock in the evening, and returned to Grafmiller's about eleven o'clock. I saw a Mexican pay Fred some money at the dance, but I don't know how much money he paid him. We went to bed at Grafmiller's and were arrested the next morning and carried to jail at Pleasanton, Texas. We had not been any place the time we left Grafmiller's house until we returned, except to the dance at Tober's house, until we were arrested the next morning at Grafmiller's house. I was present at a game of cards, which was played by Fred and Tom Sinclair and others, but did not play myself, and I saw Sinclair pay Fred after the game twenty-five dollars, it being four five dollar bills, and the balance in silver, and Ed Fern also paid Fred three dollars.

Fred had a five dollar bill and a one dollar bill when he entered the game. This was the first time that I had seen Fred since he came from the Simmons Railroad the second time.

"The witness Rindon was recalled and denied making an appointment to meet the Plackers.

"Grafmiller was recalled and denied defendants coming back to his house and waking him, and his telling them to get him some whisky, and it was at that time he missed his money. He also denied being drunk; said it was on Saturday, and he was very busy attending to his mill during the day, and was very tired after his day's work, and was anxious for defendants to leave so he could retire.

"The defendant Fred Placker testified in substance as did his brother, Wesley Packer, as above set out."

We hold that the above evidence is sufficient to support the verdict. The judgment is affirmed.

*Affirmed.*

ON REHEARING.

February 2, 1910.

RAMSEY, JUDGE.—We think, on further examination, we erred in the disposition heretofore made of this case, and that the judgment of conviction should be set aside, and the cause reversed and remanded for another trial.

1. An inspection of the evidence above quoted in the original opinion will disclose the fact that it was and is a serious question whether the evidence was sufficient to support the verdict. Out of deference to the finding of the jury, and the action of the trial court in declining to grant a new trial on that ground, we felt on original submission that we were scarcely authorized to set aside the conviction on the ground of lack of evidence. This was the only question treated in the original opinion. There are, however, several other questions raised on the appeal, some of which, in view of the fact that the case will be tried again, call for our attention and notice.

2. As a criminating circumstance, the State had shown in possession of appellant soon after the alleged theft three $5 bills. Grafmiller, from whose person the theft is charged, had lost three $5 bills. To meet this evidence appellant introduced one Ed Fern, who testified that about the day before appellant's arrest he, appellant, came to his store, and that he saw one Sinclair pay him $25—four $5 bills and the balance in silver—and that he gave one of these five dollar bills back to Sinclair on the same day. On cross-examination the State was permitted, over objection of appellant, to ask the witness for what consideration or under what circumstances this payment was made, and it developed, according to the testimony of Fern, that appellant had won this money from Sinclair in a game of cards. This was objected to for the reason that it was prejudicial, and that the tendency of it would be to prejudice appellant's cause by showing the commission of

another offense, and would, generally, have the effect to place him in a bad light before the jury. That this might have this effect is not to be denied, and yet this would, we think, be no sufficient reason to deprive the State of the opportunity to test the accuracy of the witness' statement, and to make strict and diligent inquiry into the circumstances, the reason and the consideration for such payment.

3. This same witness also testified on cross-examination that appellant had won at the same time three dollars from him. The complaint of appellant, and the circumstances touching the inquiry in respect to the three dollars, as evidenced by the bill, is to this effect: The district attorney asked the witness Ed Fern the following question: "Is it not a fact, Ed, that gamblers sometimes have money, and sometimes they don't have any?" This question and the answer expected to be elicited thereby were objected to because same was immaterial, irrelevant and incompetent to prove or tend to prove any fact in the case, and the only object and effect of the question and answer would be to prejudice the jury against this defendant by the continued allusion, on the part of the district attorney, to the gambling question. Thereupon the court overruled the objections of appellant, and in connection with his action in so doing, made the following statement: "I will overrule your objections. It is the most material question that has been asked by the State in this trial." In reply to the question so asked, the witness answered, "Yes." The above statement, which we have taken from the bill of exceptions, is somewhat modified, and to this extent: The trial court says: "The district attorney had asked the witness three or four immaterial questions, to which no objections were made, and when objection was made to his question, the court did remark: 'That is the most material question the district attorney has asked this witness.' " This we think was error. McCullar v. State, 36 Texas Cr. Rep., 213; Kirk v. State, 35 Texas Cr. Rep., 224; Cook v. State, 22 Texas Crim. App., 511; Wilson v. State, 17 Texas Crim. App., 525; Moncallo v. State, 12 Texas Crim. App., 171. We think in view of the evidence in the case, and the entire record, that while doubtless unintentional, the remark of the court on a vital question in the case must be held such an invasion of the right of the jury as to constitute reversible error.

For the reasons indicated, the motion for rehearing is granted, the affirmance is set aside, and the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

McCord, Judge, not sitting.